**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STEPHANIE SOLIS,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:25-cv-278** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER,** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

This matter is before this Court on the Medical Center's Motion for Summary Judgment and Plaintiff Stephanie Solis' Motion for Leave to File a Sur-Reply. (ECF Nos. 38, 45). For the reasons set forth below, the Medical Center's Motion for Summary Judgment and Solis' Motion for Leave to File a Sur-Reply are **DENIED**.

## I. BACKGROUND

### A. Factual Background

On March 19, 2025, Plaintiff Stephanie Solis filed a complaint against her employer, The Ohio State University Wexner Medical Center ("the Medical Center"), alleging that the Medical Center discriminated against her on the basis of her race and retaliated against her for engaging in protected activity, in violation of Title VII, 42 U.S.C. § 2000e-2. (ECF No. 1 at 11–13).

The Medical Center is an entity of the State of Ohio which employs various medical personnel to provide health care to patients at its hospitals, clinics and outpatient facilities. (*Id.* at 1). Plaintiff Stephanie Solis is an African American female born on June 5, 1975. (*Id.* at 2). She began her employment with the Medical Center as a Staff Nurse in 2011. (*Id.*). Solis earned an Associate Degree in Nursing from Ohio University in 2007, a Bachelor of Science in Nursing from

Ohio University in 2012, and a Master of Science in Nursing, Family Nurse Practitioner, from Chamberlin College of Nursing in 2016. (*Id.*).

In February 2012, Solis began working as a Staff Nurse on the Fifth Floor in the Medical Center's Vascular and Cardiothoracic Surgery Unit at Ross Heart Hospital. (*Id.* at 3). Solis still works in this position to date. (*Id.*). In 2018, Solis additionally became licensed as an Advanced Practice Registered Nurse ("APRN")[1], with a certification in Family Medical Care. (*Id.*). She contends that between 2018-2024, she applied for dozens of Advanced Practice Provider ("APP") positions at the Medical Center, for which she was qualified. (*Id.* at 3–4). Despite her qualifications, Solis alleges that she did not receive a single APP job offer from the Medical Center. (*Id.* at 4). She further alleges that because nurse practitioners are required to work at least 1,000 hours in a five-year period to maintain their license, that by 2023, she was at risk of losing her license. (*Id.*).

Accordingly, Solis began working as a nurse practitioner in addiction medicine at Ohio Health in April 2023. (*Id.*). She also continued her employment with the Medical Center as a Staff Nurse, working both jobs in a part-time capacity. (*Id.* at 3).

Following her attempts to secure a nurse practitioner role at the Medical Center, Solis submitted charges to the Ohio Civil Rights Commission, alleging that the Medical Center unlawfully discriminated against her when she was denied various APP positions in 2021 and 2022. (*Id.* at 4). In April 2023, however, Solis withdrew this charge and instead filed a lawsuit against the Medical Center in this Court alleging that the Medical Center had engaged in racial discrimination against her by failing to hire her for two separate APP positions. (*Id.* at 5); Case

---

[1] Plaintiff's licensure is also referred to as a Certified Nurse Practitioner ("Nurse Practitioner"). (ECF No. 1 at 3).

No. 2:23-cv-01390. That case was subsequently dismissed following this Court's grant of summary judgment to the Medical Center, and the Sixth Circuit affirmed this Court's Opinion & Order on October 25, 2024. (*Id.* at 5).

In May 2024, Solis again applied for an APP position at the Medical Center. This time the hospital was seeking an Addiction Medicine APP. (*Id.* at 6).[2] Solis additionally emailed Noah Grose, the hiring manager for the role, to express interest in the position. (*Id.*; ECF No. 29 at 64). The job posting specified that candidates with Addiction Medicine experience were preferred. (ECF No. 1 at 6). In relevant part, the job posting stated:

> MINIMUM REQUIRED QUALIFICATIONS
>
> Master's of Science Degree or DNP in Nursing or Master's in Physician Assistant Science. APRN License with Certification as an NP or PA-C. 0 years of relevant experience required. 0-2 years of experience preferred.
>
> …
>
> <u>Position Summary</u>
>
> The APP provides health care services to patients working in collaboration with a licensed physician member of the medical staff. Healthcare services provided include care during acute and chronic phases of illness, education, and counseling of individuals and families, health promotion and prevention, and referral to other healthcare providers and community resources when appropriate.

---

[2] The annual base salary for the APP Addiction Medicine position was $107,141.66. (ECF No. 1 at 8).

> The position will be to expanding Addiction Medicine Consult services at OSU-East. A fast paced service consult service providing assistance with individuals with addiction.
>
> …
>
> Minimum Qualifications
>
> Master's Degree in Nursing; Current certificate of authority to practice as an APRN in the State of Ohio Graduate of a Nurse Practitioner program that qualifies the graduate to sit for the certification examination of a national certifying organization recognized by the Ohio Board of Nursing
>
> OR
>
> Masters Prepared; Graduate of a PA-C program that qualifies the graduate to sit for the certification examination recognized by the National Certification Commission for Physician Assistant (NCCPA). Eligibility for State of Ohio licensure as a PA-C.

(ECF No. 1-2 at 1–3).

Plaintiff asserts that Noah Grose, the hiring manager, was familiar with Solis and was also the hiring manager when Solis applied for the OSU APP position Solis had applied to in 2021. (ECF No. 29 at 18). Prior to her interview for the 2021 position, Grose had an informal meeting with Solis during which he gave her career advice on how she could get an APP position at the Medical Center. (ECF No. 22 at 135–38). Solis and Grose did not have any further contact between their 2021 meeting and her interview for the instant position in May 2024. (ECF No. 29 at 27). Grose, however, was aware that Solis had filed a charge of discrimination and a lawsuit against

the Medical Center in 2022, due to him being included in the litigation hold. (ECF No. 22 at 132–33).

According to Grose, twenty-one applicants, including Solis, applied for the 2024 Addiction Medicine APP position. (ECF No. 38-1 at 1). He and Randy Yadav[3], another APP at the Medical Center, were responsible for reviewing applications and ultimately narrowing down the pool of applicants to a few contenders who would then get passed onto the team responsible for the final hiring decision. (ECFS Nos. 21 at 15; 22 at 24–25). That team consisted of: Dr. Julie Teater (psychiatrist in addiction medicine and medical director of OSU's systemwide addiction program), Dr. Orman Trent Hall (an addiction medicine physician at OSU-East), and Alison Miller (addiction medicine administrator). (ECF Nos. 22 at 25; 21 at 79–80; 34 at 8–9).

On May 8, 2024, Grose emailed Yadav, highlighting a list of "real potential applicants." (ECF No. 22-3 at 1). This list did not include Solis. (*Id.*). After an initial review of the applicants, Yadav emailed Grose a summary of all applicants, in which he highlighted the top seven applications from his perspective. (ECF No. 1-5). Yadav ranked Solis number six. (ECF Nos. 1-5, 1-6). Yadav additionally noted that he sent interview invitations to the top seven applicants, of which six responded, including Solis. (ECF No. 1-5). After interviewing the six candidates who replied, Yadav and Grose advanced four candidates to the next round of interviews with the selection team. (ECF Nos. 21 at 81; 22 at 80–81). Solis was not advanced. (*Id.*).

Solis contends that despite having over 13 months of experience in Addiction Medicine, and meeting the minimum qualifications for the position, she was again denied employment.[4]

---

[3] Yadav, unlike Grose, was allegedly not aware of Solis' race or the fact that she had previously sued the Medical Center for discrimination. (ECF No. 21 at 11; 28–29).

[4] As support for her claims, Solis alleges that she is well regarded in both her roles at the Medical Center and Ohio Health. (ECF No. 13 at 5). She contends that she has consistently received positive performance evaluations and has only been disciplined once in her career at the Medical

(ECF No. 1 at 6–7). The APP position was instead awarded to Jane Ginther, a white candidate whose resume did not specify any prior addiction medicine experience. (*Id.* at 7). Solis additionally highlights that the Medical Center was aware of the chosen candidate's lack of addiction experience, noting that the candidate had "No psych/addiction experience." (*Id.*). Grose and Yadav noted, however, that the selected candidate performed very well in the interview process, seemed passionate, and had done extensive research in the addiction medicine field. (ECF Nos. 21 at 48, 52–54; 22 at 53).

After she was informed that she was no longer in consideration for the APP position, Solis emailed Grose and Yadav, and expressed gratitude for the opportunity, reiterated her interest in future opportunities, and requested feedback from her interview. (ECF No. 22-6 ). Grose responded, in relevant part:

> As I mentioned in our discussion, we had multiple individuals who applied for this position some with and some without Addiction Medicine and/or APP experience at all. Individuals who moved forward had specific addiction medicine experience, of those individuals you made the cut to meet with myself and Randy.
>
> You are doing the right things by gaining experience and working as an APP, we had individuals who had more APP experience in Addiction Medicine than you and specifically starting and building an addiction medicine IP team, and clinical/academic research directly related to the Addiction Medicine population.
>
> My recommendation to you would be to continue gaining experience and go above and beyond your competition. Work on a poster presentation, give a lecture to the CON or other APP organizations about the treatment of Addiction Medicine, be active in the community, etc. There are so many individuals in this field, and you must set yourself apart from them on paper and articulate that in the interview as well.
>
> Good luck in the future!

(*Id.*).

---

Center for tardiness in 2016. Solis additionally cites that her most recent employment evaluation noted that she was a "real joy to work with." (*Id.*).

On July 22, 2024, Solis submitted additional charges of unlawful race and age discrimination and retaliation to the OCRC and EEOC stemming from her rejection for the 2024 Addiction Medicine APP position. (ECF No. 1 at 8). Plaintiff subsequently withdrew the OCRC charge in October 2024 but was issued a Right to Sue Letter for the EEOC charge on December 27, 2024. (*Id.*).

Solis argues that the Medical Center's racial statistics may indicate that her rejection for the Addiction Medicine position is indicative of racial discrimination by the Medical Center. (ECF No. 1 at 9). The Medical Center's 2023 records demonstrate that 729 of the 860 APPs employed by the Medical Center at the time were White, and that 49 of the 860 APPs employed by the Defendant were Black or African American. (ECF No. 35, Exhibit D). She further contends that based on the relevant labor market, there is a statistically significant difference between the expected number of African American APPs employed at the Medical Center compared to the actual number of African American APPs employed at the Medical Center. (ECF No. 1 at 10). Specifically, Solis had Harvey S. Rosen, Ph.D., conduct a Chi-Square statistical test which indicated that the Medical Center employed only 49 African American APPs, whereas 86 Black APPs were expected to be employed based on the relevant labor market. Dr. Rosen opined that this was a statistically significant difference that was so large it was unlikely to be due to random chance. (ECF No. 35, Exhibit D).

Accordingly, Solis claims that the Medical Center discriminated against her because of her race and lacked a legitimate business reason for not hiring her. (ECF No. 1 at 12). She additionally argues that the Medical Center's actions were retaliatory for her prior protected activity against them. (*Id.*).

**B. Procedural History**

On or about July 22, 2024, Solis filed a charge of discrimination with the EEOC related to these claims. (ECF No. 1 at 8). The EEOC later issued a notice of Right to Sue on December 27, 2024. (*Id.*). Then, on March 19, 2025, Solis filed her Complaint against the Medical Center alleging race discrimination and retaliation in violation of Title VII. (ECF No. 1). On January 23, 2026, the Medical Center filed its Motion for Summary Judgment. (ECF No. 38). Subsequently, Solis filed her Opposition Motion and a Motion for Leave to File a Sur-Reply. (ECF Nos. 41, 45). These Motions have been fully briefed and are now ripe for this Court's review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. LAW AND ANALYSIS

### A. Motion for Leave to File a Sur-Reply

As an initial matter, this Court addresses Solis' Motion for Leave to File a Sur-Reply. Generally, sur-replies are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (citation omitted). Further, the Federal Rules of Civil Procedure do not contemplate the filing of sur-replies. This Court's Local Civil Rules permit additional memoranda only "upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). While the Rules do not define good cause, the Sixth Circuit has noted that additional filings "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). Even so, courts in the Southern District have permitted parties to file sur-replies without showing good cause when it did not result in prejudice toward the opposing party. *See Nat'l City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007)(citations omitted).

In support of her Motion for Leave to File a Sur-Reply, Solis asserts that good cause exists to clarify misstatements of critical facts raised in the Medical Center's reply brief. (ECF No. 45 at 3). Specifically, Solis takes issue with the Medical Center contending that its alleged falsehood about Ginther's Acute Care Nurse Practitioner certification was a typographical error. (ECF No. 45-1 at 2). Additionally, Solis raises issue with the Medical Center's explanation that in its statement to the OCRC stating that Solis failed to provide her addiction medicine experience in the interview, it was only referring to her addiction-related community service. (*Id.* at 2). This Court is well-equipped to analyze the record in front of it and glean the facts without additional briefing from

the parties. Additionally, this Court has since presided over oral argument and some of Plaintiff's concerns were addressed then. As such, allowing a sur-reply in this context would not be of service to this Court and would only allow Solis to get the last word. *See Spitzer Autoworld Akron, LLC v. FCA US LLC*, 2023 WL 4842669, at *1 (N.D. Ohio Feb. 8, 2023). Accordingly, Solis' Motion for Leave to File Sur-Reply (ECF No. 45) is hereby **DENIED**.

### B. Summary Judgment Motion

#### 1. Title VII - Racial Discrimination

Pursuant to Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e–2(a)(1). To establish a race discrimination claim under Title VII, a plaintiff must demonstrate either direct or circumstantial evidence of discrimination. *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997). Solis seeks to establish an indirect violation. To prevail on an indirect discrimination claim, a plaintiff must first establish a prima facie case under the *McDonnell-Douglas*, burden-shifting framework. *McDonnell Douglas v. Green,* 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to present a legitimate, nondiscriminatory reason for the alleged violative conduct. *Burdine*, 450 U.S. at 253 (citing *McDonnell*, 411 U.S. at 802). If the defendant presents a nondiscriminatory reason successfully, the burden then shifts back to the plaintiff to prove that the defendant's explanation is merely a pretext for discrimination. *Id.*

##### *a. Prima Facie Case*

To establish her prima facie case, Solis must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for the position; (3) she faced an adverse

employment decision; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Laster v. City of Kalamazoo,* 746 F.3d 714, 727 (6th Cir. 2014) (citations omitted). The Medical Center does not dispute prongs one through three. The Medical Center, however, does contend that Solis cannot establish the fourth prong because Ginther, the selected candidate, had superior qualifications in comparison to Solis for the position. (ECF No. 38 at 13).

The Medical Center highlights that Ginther possessed five years of full-time APP experience at the time of her selection. (*Id.* at 14). Juxtaposed with Solis' thirteen months of part-time APP experience, the Medical Center contends that Ginther had approximately ten times more experience than Solis. (*Id.*). Such longer term APP experience, though not specifically in the addiction medicine field, was credited more than Solis' shorter-term addiction medicine specific experience. Additionally, the Medical Center highlights that Ginther had obtained a doctoral degree whereas Solis had only a master's degree. (*Id.*). In response, Solis contends that she is not required to prove that her qualifications were the exact same as Ginther's; rather, she must merely demonstrate that her qualifications were *similar*. (ECF No. 41 at 20). Accordingly, Solis argues that considering whether Ginther's experience was superior is premature at this stage. (*Id.* at 21).

The Sixth Circuit has reasoned that "in a failure to promote claim, the emphasis in the fourth element is on the relative qualifications of the plaintiff and the employee who received the promotion." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011) (citing *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240–41 (6th Cir. 2005). Further, while the plaintiff need not establish that she had the *exact* same qualifications of the selected candidate, she must establish that they were "similarly situated." *Id.*

For example, in *Provenzano v. LCI Holdings, Inc.*, the Sixth Circuit affirmed that the plaintiff satisfied the fourth prong where she demonstrated that she had more experience and education than the selected candidate, in addition to more experience as a supervisor, whereas the selected candidate had a stronger performance record, and did not have any written or verbal warnings in comparison to the plaintiff having multiple documented counselings. *Id.* ("Although their strengths and weaknesses were in different areas, [plaintiff's] experience and education made her similarly qualified to [the selected candidate]. This is the extent of the inquiry at the prima facie stage and [the plaintiff] satisfied it.").

As a threshold matter, Solis is not correct that Ginther's experience is not relevant at this stage. The Sixth Circuit has reasoned that to establish the fourth prong, the plaintiff must show that she is similar "in all *relevant* respects," meaning that the Court must conduct an independent review of the plaintiff's qualifications compared to the selected candidate. *Perkola v. Univ. of Michigan Bd. of Regents*, 2018 WL 1522436, at *11 (E.D. Mich. Mar. 28, 2018)(emphasis added). Accordingly, considering whether Ginther had superior experience is not premature at this stage. *Id.* (citing *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 525 (6th Cir. 2015) ("Candidates do not have similar qualifications when one candidate has objectively 'superior experience in material and relevant respects' of attributes associated with the position sought."); *see also White*, 429 F.3d at 243) ("Some comparison between [the plaintiff and the person ultimately selected] is therefore necessary in considering the fourth prong of the *prima facie* case. Engaging in such a comparison does not impermissibly conflate the two stages of the *McDonnell Douglas* test...."). It is also not true that Solis needs merely to show that she was minimally qualified for the job. *Perkola*, 2018 WL 1522436, at *12. On the other hand, and contrary to the Medical Center's contentions, what Grose and Yadav subjectively focused on in making their

advancement determinations, has nothing to do with whether the candidates were objectively similarly situated in terms of experience. At this stage, this Court must focus only on whether the two candidates were similarly situated based on the evidence in the record. *Id.*

Thus, this Court will now conduct an independent review of the qualifications of Solis and Ginther based on the evidence presented. Solis is a licensed Nurse Practitioner and obtained a Master of Science in Nursing, Family Nurse Practitioner, in 2016. (ECF No. 1 at 2). At the time of her application, she additionally had over a year of experience as an APP in addiction medicine at Ohio Health, a program which she started in August 2023. (ECF No. 29 at 112–15). In her role at Ohio Health, Solis developed care plans with a multidisciplinary team of providers and prescribed medication. (ECF No. 29 at 67–69). On the other hand, Ginther, the selected candidate, who is a white female, had a doctoral degree and over five years of experience as an APP. She additionally conducted research and published various articles and posters on opioid use disorders. (ECF No. 30 at 44–60). Notably, however, the majority of Ginther's research and poster presentations primarily focused on combatting bias against people with opioid use disorders and the stigma caused by certain clinical language used with this patient population, as opposed to the treatment of addiction. (ECF No. 22-9 at 5). Additionally, Ginther did not have addiction medicine specific APP experience. (ECF No. 1-4). In her deposition, however, she testified that she cared for various patients with opioid use disorders. (ECF No. 30 at 15–17).

Viewing the evidence in the light most favorable to Solis, this Court finds that a reasonable juror could find that the two candidates were similarly situated, if not that Solis was more qualified. Both possessed the relevant education and had experience as APPs. While Ginther had more APP experience, and conducted opioid use disorder research, her qualifications are not so exceptional to Solis' shorter, but more relevant experience, for this Court to find that Ginther was objectively

superior. *See Provenzano*, 663 F.3d at 814. Additionally, despite the Medical Center's contentions that Ginther was far more experienced given her research and poster presentations, such is not persuasive where the bulk of her research was on the stigma related to substance use disorder as opposed to research in addiction medicine treatment. Solis, on the other hand, had concrete experience in providing addiction medicine treatment. Given that the plaintiff's burden for establishing a prima facie case is not intended to be onerous, this Court finds that Solis has satisfied the fourth prong and therefore established a prima facie case. *Perkola*, 2018 WL 1522436, at *11.

*b. Legitimate Non-Discriminatory Rationale*

Given Solis has met her burden of establishing a prima facie case, the burden now shifts to the Medical Center to provide a legitimate nondiscriminatory rationale for its conduct. "The burden that shifts to the defendant ... is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254. At this stage, "the defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Moreover, the defendant must merely create a genuine issue of fact as to whether it discriminated against the plaintiff by setting forth a "legally sufficient" reason for the employer's action. *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 666 (6th Cir. 2000) (quoting *Burdine*, 450 U.S. at 255).

The Medical Center contends that it did not select Solis for the position because she was not the best-qualified candidate. (ECF No. 38 at 16). Specifically, the Medical Center argues that Ginther was ranked over Solis because she possessed a terminal (doctoral) nursing degree, had five years of APP experience, and had conducted extensive research in addiction medicine. (*Id.* at 17). Yadav testified that APP experience generally was what he prioritized when ranking the candidates, which is why every candidate ranked higher than Solis had more experience as an APP than she did. (ECF No. 21 at 37–38). Grose similarly testified that while addiction medicine

experience was preferred, general APP experience was the primary factor. (ECF No. 22 at 17). He further specified that "[e]veryone above her has more experience as an APP than she does regardless of addiction medicine, and there's a bunch of people that have more addiction medicine experience than her. She's in the top third of our group for sure, that's why she got an interview, but she's inferior to the top third." (*Id.* at 69–70).

Solis does not refute that the Medical Center has satisfied its burden of presenting a legitimate, non-discriminatory reason for its conduct. Additionally, this Court finds that the Medical Center has satisfied its burden where it provided evidence of its reasoning through the undisputed deposition testimony of Yadav and Grose. *See Carter v. City of Troy, Ohio*, 714 F. Supp. 3d 941, 954 (S.D. Ohio 2024) (finding the defendant had offered a legitimate and non-discriminatory reason for its decision not to hire plaintiff by providing a deposition testimony of someone who sat in on the candidate interviews which backed up the defendant's reasoning).

*c. Pretext*

Since the Medical Center has offered a legitimate, nondiscriminatory explanation for its actions, the burden now shifts back to Solis to establish that the Medical Center's rationale was a mere pretext for discrimination. Solis now bears the burden to demonstrate "evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Pizzimenti v. Oldcastle Glass Inc.*, 666 F. Supp. 2d 839, 847 (N.D. Ohio 2009). The Sixth Circuit has reasoned that this burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Cline*, 206 F.3d at 666 (quoting *Burdine,* 450 U.S. at 255–56). To demonstrate pretext, Solis must demonstrate that the Medical Center's offered rationale: "(1) has no basis in fact; (2) did not actually motivate the

defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Carter*, 714 F. Supp. 3d at 955 (citing *Provenzano*, 663 F.3d at 815).

i. Falsehoods by the University

First, Solis argues that pretext can be inferred because the Medical Center's offered reasons for not hiring Solis are factually false. (ECF No. 41 at 28). Solis highlights that in its OCRC submission, the Medical Center claimed that Solis did not provide her addiction medicine experience during the interview. (ECF No. 22-8 at 4). Additionally, Solis argues that in that same submission, the Medical Center falsely stated that Ginther had an "Adult Gerontology Acute Care Nurse Practitioner certification." (*Id.* at 6). Solis contends that these statements in the OCRC letter demonstrate dishonesty and shifting rationales in the Medical Center's explanations for not hiring her which are both evidence of pretext. (ECF No. 41 at 28).

In response, the Medical Center contends that the OCRC position statement should not be considered because it is inadmissible hearsay. (ECF No. 44 at 15). Additionally, the Medical Center argues that Rule 408 bars such evidence of statements made during compromise negotiations. (*Id.*). The Medical Center highlights that the disclaimer at the top of the letter states that the intent of the letter is only for cooperating with the OCRC to achieve resolution. (ECF No. 22-8). The Medical Center further contends that the admission of the letter would be more prejudicial than probative to the Medical Center. (ECF No. 44 at 16). The letter included the following disclaimer:

> This statement is submitted solely in the interest of cooperating with the Ohio Civil Rights Commission in an effort to achieve informal administrative resolution of this Charge. In submitting this statement of position and response with attachments, OSU does not waive any defenses it may have to the Charge or in any way prejudice itself with respect to any issue, whether of a procedural, factual or substantive nature. In addition, the information contained herein is being submitted on the basis of the author's current understanding of the facts, which could change as more information is gathered. OSU submits this position statement with the understanding and on the condition that all information contained herein, excluding exhibits,

> will be excluded as evidence at any trial of this matter pursuant to Federal Rule of Evidence 408 and any other applicable federal rule of law, and any corresponding state rule of evidence or applicable law. This statement is not intended to be all-inclusive, and OSU reserves the right to amend this statement in the event it discovers additional relevant information. This position statement, including all exhibits, is a confidential settlement-related communication that contains private business information about OSU and for this reason OSU objects to its disclosure to any third party.

(ECF No. 22-8).

Rule 408 provides in relevant part that evidence of "conduct or a statement made during compromise negotiations about the claim" may not be used "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. While the Medical Center's disclaimer in its OCRC letter characterizes the letter as a "confidential-settlement related communication," such does not make the letter a part of settlement talks in reality. The letter documents the Medical Center's position statement and response to the charge of discrimination. The letter does not contain any traditional "compromise negotiations" but rather declares that Solis' claims are entirely without merit. The letter is actually an instrument of advocacy, not one of either negotiation or compromise. Accordingly, this Court does not believe the letter to be within the purview of Rule 408.

Additionally, the Medical Center's contention that the OCRC letter is admissible hearsay is also without merit. First, the letter is admissible under the party admissions rule. *See* Fed R. 801(d); *see also Mosby v. Reaves L. Firm, PLLC*, 2025 WL 1223107, at *6 (W.D. Tenn. Apr. 28, 2025)("Defendant's Position Statement, definitionally a statement made by Defendant or its authorized agent, would not be hearsay when offered by Plaintiff, the opposing party."). Second, in addition to claiming that the letter documents the Medical Center's falsities, Solis contends that the letter demonstrates the Medical Center's shifting reasons for not hiring her. (ECF No. 41 at 28–49). In that sense, where the letter is not being offered for the truth of the matter asserted, such

cannot be inadmissible hearsay and is relevant to demonstrate pretext. *Mosby*, 2025 WL 1223107 at *7 ("The position statement is relevant to pretext to the extent that it evinces a shifting justification for Plaintiff's termination. As a statement produced by Defendant, it is an opposing party's statement and not hearsay."). Thus, this Court will consider the OCRC letter at this stage.

Since this Court deemed the OCRC letter admissible, this Court will now consider whether the OCRC letter demonstrates that the Medical Center's proffered reasons for not hiring Solis were factually false. The OCRC letter states that Solis was not advanced because "she had limited nursing experience in Addiction Medicine and she did not provide her experience in this area during the interview." The letter further states that, "[f]ollowing the interview process, [Solis] emailed Grose with details that would have been relevant during the interview, yet she did not provide that information at the time." (ECF No. 22-8 at 4). This Court reasons that while Solis did supplement her addiction medicine experience in her email to Grose following the interview, the Medical Center's statement that "she did not provide her experience in this area during the interview" is false. Solis certainly discussed her addiction medicine experience during the interview. She testified that during the interview, she informed Grose and Yadav of her experience setting up addiction medicine services at Ohio Health. (ECF No. 29 at 109–110). And both Grose and Yadav testified that Solis did discuss her addiction medicine experience during the interview. (ECF Nos. 21 at 93–94; 22 at 85–86, 90–91). While the Medical Center argues that this issue is merely a matter of interpretation as opposed to blatant falsity, it is inaccurate to state that Solis did not provide her addiction medicine experience during the interview, even considering that she may not have provided *all* of her relevant experience during the interview.

Additionally, the second falsity that Solis takes issue with is that the letter states that Ginther had an "Adult Gerontology Acute Care Nurse Practitioner certification." (ECF No. 41 at

28). This is also not true. While the Medical Center contends this a mere typological error,[5] such does not take away from the fact that it was cited in an official position statement as a reason for the Medical Center viewing Ginther as superior to Solis. Viewing the evidence in the light most reasonable to Solis, this Court cannot in good faith credit the Medical Center's contention that this was merely a mistake, especially considering the "error" appeared in an official position statement to the OCRC, and the attention to detail expected in preparing such legal documents. *See Eades v. Brookdale Senior Living, Inc.*, 401 F. App'x 8, 12–13 (6th Cir. 2010) (discounting an employer's attempts to minimize proffered reasons stated in an EEOC position statement where the employer failed to explain how a senior legal Vice President made such a mistake). Accordingly, this Court finds that these falsities demonstrate pretext.

*ii. Shifting Rationales*

Next, this Court further analyzes Solis's shifting rationale argument. Solis is correct that conflicting rationales may be sufficient to establish pretext. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision"); *see also Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."). In the summary judgment context, the court does not only evaluate whether changes in an employer's rationale occurred but "whether the circumstances could permit a rational factfinder to conclude that these changes are indicative that the currently proffered explanation is false." *Eades*, 401 F. App'x at 13; *see also Asmo v. Keane, Inc.*, 471 F.3d

[5] The Medical Center argues that it mistakenly wrote that Ginther had this certification when in reality it was referring to Holly Poling, the individual hired for the Thoracic Surgery position that Solis also applied for. (ECF No. 44at 18).

588, 596 (6th Cir.2006) (inconsistencies between initial employer communications with the plaintiff and the reasons asserted in the lawsuit are "suspicious" and "evidence of pretext.").

For example, in *Asmo v. Keane*, the Sixth Circuit reviewed the district court's finding that the plaintiff failed to establish pretext. 471 F.3d at 594–96. There, the plaintiff pointed to inconsistencies in the employer's initial reasons given when terminating the plaintiff compared to the reasons given to the OCRC and the district court. *Id.* at 596. In the initial termination phone call, the employer stated five reasons for the termination: "1) Asmo had the fewest hires of the SG&A recruiters; 2) Asmo had the same as or less seniority than the other SG&A recruiters; 3) Asmo's salary was higher than the other SG&A recruiters; 4) Asmo's expenses were higher than the other SG&A recruiters; and 5) Asmo did not get the 'face time' that other SG&A recruiters got." In its reasons to the district court and its position statement to the OCRC, however, the employer only stated three reasons for the termination: "1) Asmo had the fewest hires of the (SG&A) recruiters; 2) Asmo had the same as or less seniority than the other SG&A recruiters; and 3) Asmo's region had the lowest anticipated hiring needs in 2002." *Id.*

During the district court proceedings, however, the employer no longer cited Asmo's high salary and high expenses compared to the other SG&A recruiters as proffered reasons for the termination, because such reasons were determined to be false. The Sixth Circuit found this to be demonstrative of pretext. *Id.* The Court reasoned that while it was unclear why the false reasons were given initially, the fact that those reasons were later eliminated was "very suspicious" and strategic by the employer. *Id.* ("Once a lawsuit was filed and [the employer] knew the reasons would be subject to scrutiny, it changed the justifications offered for Asmo's termination to include only those that were either circumstantially true or could not be as easily penetrated as false. This change in rationale is suspicious and is evidence of pretext.).

Additionally, the Sixth Circuit recognizes that additional, non-discriminatory reasons for an employment decision are permissible if they do not contradict the initial proffered reasons. *See Macdonald-Bass v. J.E. Johnson Contracting*, 493 F. App'x 718, 726 (6th Cir. 2012) (citations omitted). Conflicting testimony indicating a shift in rationale coupled with false information provides a genuine dispute of material fact for pretext to be decided by a jury. *Fuller v. Mich. DOT*, 580 F. App'x 416, 427 (6th Cir. 2014) (two supervisors gave conflicting testimony about the strength of an employee's interview while a memo drafted for litigation made no mention of the interview); *cf. Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481 (6th Cir. 2011) (the decision-maker's expanded list of reasons for the termination between the time of the employee's removal and the decision-maker's deposition, did not establish a shifting rationale). Here, this Court finds that a rational factfinder could determine that the Medical Center has shifted its rationale, indicating that the Medical Center's proffered explanation is false, and that the shifting rationales contradict the Medical center's proffered reasons.

In the Solis-Grose email exchange following Solis' first round interview, Grose indicated to Solis that she was selected from the initial pool of candidates because she possessed specific addition medicine experience, while others who lacked such experience did not make the cut. (ECF No. 22-6). Grose further explained that Solis' candidacy terminated after the first round because: (1) there were candidates who had more APP experience in Addiction Medicine than her; (2) there were candidates with more experience specifically starting and building an addiction medicine IP team; and (3) there were more candidates with clinical/academic research directly related to the Addiction Medicine population. (*Id.*).

Subsequently, in the OCRC letter, the Medical Center proffered that Solis did not get the job because Ginther's experience was superior to Solis' experience. The letter specifies that

according to Grose and Yadav, Solis did not advance to the hiring team interview phase because: (1) she had limited nursing experience in Addition Medicine; and (2) she did not provide her experience in this area during the interview. (ECF No. 22-8 at 4). The letter went on to state that: (3) Ginther possessed an Adult Gerontology Acute Care Nurse Practitioner certification; (4) Ginther had extensive research in addiction medicine; and (5) that Ginther's nursing experience was a better fit for the position. (ECF No. 22-8 at 6–7).

Now, during this litigation, the Medical Center echoes some of the above-mentioned reasons as to why Solis did not advance to the hiring team interview, adds new reasons, and eliminates reasons cited to the OCRC. As outlined in the email and letter, the Medical Center reiterates that other candidates, like Ginther, had more general APP experience than Solis which the Medical Center valued over addiction medicine specific experience. (ECF No. 44 at 12). Additionally, the Medical Center consistently contends that Ginther had conducted more academic research and poster presentations than Solis. (*Id.* at 12–13). For the first time, however, the Medical Center mentions that unlike Ginther, Solis did not interview well. (*Id.* at 13). And notably, the Medical Center no longer contends that Ginther possessed an Adult Gerontology Acute Care Nurse Practitioner certification, or that Solis did not bring up her addiction medicine experience during the interview. (*Id.* at 18). Instead, as discussed above, the Medical Center attempts to clarify and explain these former reasons away as mistakes.

This Court finds this case analogous to *Asmo*. While this Court cannot be entirely sure that these two falsities (that Ginther possessed a certification she did not actually have and that Solis did not mention her addiction medicine experience during the interview) were written in the OCRC position statement by mistake, or that these reasons are being misconstrued, such at minimum is suspicious where the Medical Center has changed its tone to this Court, knowing that its offered

reasons are now subject to greater scrutiny. *Asmo*, 71 F.3d at 596. Additionally, while the Medical Center clings to its position that providing additional, non-contradictory reasons for the firing is not demonstrative of pretext, such argument does not capture the whole picture. The Medical Center has not merely added additional support for why it decided that Ginther was the superior candidate. Like the employer in *Asmo*, it has now eliminated two of the proffered reasons it initially cited to the OCRC. This is demonstrative of shifting rationales which contradict the proffered reasons.

Moreover, at this stage, this Court need not find that these inconsistencies will certainly lead to the conclusion that the Medical Center engaged in race discrimination; such a determination should be left to a rational factfinder to conclude whether there is suspicion and thus pretext for racial discrimination. Thus, there exists genuine issues of material fact well-suited for a jury to decide.

iii. Statistical Evidence

Solis also argues that the statistical analysis conducted by Dr. Rosen infers pretext. The Sixth Circuit has reasoned that statistical evidence "may evince pretext when the statistics indicate a disproportionate pattern of conduct, such as hiring or firing, toward a protected group. *Solis v. Ohio State Univ. Wexner Med. Ctr.*, 2024 WL 4579501, at *6 (6th Cir. Oct. 25, 2024) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466–68 (6th Cir. 1990)). Such evidence, however, must be based on the relevant labor market and "must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Barnes v. GenCorp Inc.*, 896 F.2d at 1466; *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (quoting *Barnes*, 896 F.2d at 1466).

Solis contends that Dr. Rosen's statistical evidence, which was based on the relevant Greater Columbus Metropolitan Area labor market, shows that the Medical Center employed less Black APPs than expected. During the relevant period, the Medical Center employed only 49 Black APPs, compared to 729 white APPs, out of 860 total APPs. (ECF No. 35, Exhibit D). Dr. Rosen conducted a Chi-Square test of these numbers and found that based on the relevant market, the expected number of Black APPs at OSU should have been 86 and the expected number of white APPs should have been 704. Dr. Rosen opined that, there is a statistically significant difference between the expected and actual values and that "[t]he disparity in racial employment of APPs at the OSU Medical Center is substantial and provides compelling evidence that the observed racial differences are unlikely to be attributable to random variation." (*Id.*).

In opposition, the Medical Center, through its expert, Rick Holt, argues that Rosen's analysis consisted of a simplistic percentage comparison that failed to account for the people who actually applied for this relevant set of job postings. (ECF No. 38 at 22–23). Additionally, the Medical Center contends that Solis' statistical evidence does not eliminate the most common nondiscriminatory explanation for Solis not advancing to the next round of interviews: that she was inferior to the other candidates. (*Id.* at 24–25).

This Court finds that Solis' statistical evidence creates a genuine issue of material fact. As to the Medical Center's critiques that Dr. Rosen's calculations are not relevant in terms of addressing whether discrimination occurred in this discrete case, such is not relevant at this stage. As mentioned above, in the Sixth Circuit, statistical analysis must be based on the relevant labor market. *Solis*, 2024 WL 4579501, at *6 . There is no requirement that an expert must look at the underlying materials of the applicants in this specific case for the analysis to be relevant. Additionally, at this stage, Solis need not present statistical analysis that overcomes all critiques.

*Barnes*, 896 F.2d at 1467 ("[a]t the summary judgment stage, a plaintiff is not required to anticipate and rebut every possible weakness in his otherwise valid statistical evidence."). Instead, Solis must present evidence that demonstrates a statistically significant disparity, which she has done. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437 (6th Cir. 2002) (finding that the plaintiff had demonstrated that the disparity between percentage of African American security guards and African American security guard managers was not due to chance where the difference was statistically significant).

Finally, this Court recognizes that statistical evidence is not probative of pretext on its own. Such evidence must be paired with some other evidence of pretext that eliminates the most common nondiscriminatory explanations for the disparity. *Peeples*, 891 F.3d at 635. Here, where Solis has pointed to factual inaccuracies on behalf of the Medical Center in its reasoning to the OCRC for Solis' firing, such evidence coupled with the statistically significant difference in Black APPs hired compared to White APPs creates a genuine issue of fact as to whether the Medical Center's proffered reasons constitute pretext. *Hopson*, 306 F.3d at 437–38 (reasoning that where "significant statistics are coupled with independent circumstantial evidence of discrimination, the plaintiff has met his burden of demonstrating that the statistical disparity is more likely than not due to the defendant's bias, and the defendant is not entitled to summary judgment."). Thus, this factor also weighs in favor of Solis.

#### iv. Irregularities in the Hiring Process and Emphasis on Skills Not in the Job Description

Solis additionally argues that irregularities in the hiring process and an emphasis on skills not in the job description are evidence of pretext. This Court is not persuaded by either argument. First, Solis argues that Ginther's "preselection" for the position was indicative of pretext. (ECF

No. 41 at 37). As support, she relies on two cases. In the first case, *Fijalkowski v. Belmont Cnty. Bd. of Commissioners,* the plaintiff presented testimony of one commissioner stating that she believed two of the other commissioners had decided to hire the selected candidate four months prior to the formal search. The plaintiff also presented evidence that the person who was hired was begged to apply multiple times despite declining. 2021 WL 1964478, at *8 (S.D. Ohio May 17, 2021). In the second case, *George v. Youngstown State Univ.*, the plaintiff presented evidence that the university had changed the job requirements so that the selected candidate would be eligible. 966 F.3d 446, 466 (6th Cir. 2020).

Here, Solis contends that Grose had invited Ginther to his office to discuss the position, which was a gesture he did not make for other candidates. Second, Solis highlights that Grose listed Ginther on a list of "real potential applicants." Compared to Solis' cited cases, however, this Court does not find these two factors to be indicative of pretext. While it is clear Grose knew Ginther and had a pre-formed positive image of her, such does not prove she was preselected where Grose was neither a final nor the only decisionmaker. Yadav also independently ranked Ginther as one of his top candidates without knowing her. (ECF No. 1-5 at 2). This Court also takes note that while Ginther was ultimately hired she was not offered the job initially. Jennifer Eilers was initially offered the job but rejected the offer. (ECF No. 22 at 105, 126). Thus, Solis' contention that Ginther was preselected is weak. Further, unlike in *George*, there is no evidence that the Medical Center changed the job requirement to favor Ginther. Thus, this Court does not find irregularities present in the hiring process that support pretext here.

As to Solis' arguments that the Medical Center emphasized skills not present in the job description and did not follow its own guidelines, this Court is not entirely persuaded. Solis contends that the Addiction Medicine APP job description does not mention research anywhere,

and therefore, the Medical Center's emphasis on Ginther's extensive research experience demonstrates pretext. (ECF No. 41 at 31–32). The job description mentions that it preferred "relevant experience," but does not define relevant experience. Therefore, it is more than reasonable that the Medical Center would credit Ginther's research experience, which is indicative of field knowledge, to glean insight into whether she would be able to perform her essential job functions. Notably, however, the fact that Ginther's research focused on the stigma associated with substance use disorders more so than it did the treatment of substance use disorders is suspect to this Court. While this Court need not agree with rationale in the hiring decisions and the criteria emphasized by the Medical Center, the Medical Center's crediting of research only tangentially related to the actual function of the job begs the question of pretext. On the other hand, it is not unfathomable that the Medical Center valued Ginther's knowledge regarding the appropriate clinical language to use amongst the patient population she'd be working with. For purposes of the pretext analysis, this Court views this factor as neutral.

In summary, this Court finds that Solis has created a genuine dispute of material fact as to whether the Medical Center's selection of Ginther over her for the Addiction Medicine APP role was pretextual. This is based on Solis presenting statistical evidence demonstrating a statistically significant disparity of Black APPs hired by the Medical Center compared to white APPs, coupled with the falsities that the Medical Center presented to the OCRC, and its shifting rationales.

Accordingly, the Medical Center's motion for summary judgment as to the Title VII race discrimination claim is **DENIED**.

**2. Title VII - Retaliation**

Solis' retaliation claim must be examined under the same burden shifting framework as her race discrimination claim. *George*, 966 F.3d at 459. In order to establish a prima facie case for a

retaliation claim however, Solis must establish that: "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Id.* (quoting *Laster*, 746 F.3d at 730). "To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a "but for" cause of the employer's adverse action against her, meaning the adverse action would not have occurred absent the employer's desire to retaliate." *Id.* Here, the Medical Center only challenges the fourth prong, that Solis cannot establish a causal connection between her protected conduct and not being selected for the position. (ECF No. 38 at 27). [6]

Solis argues that she engaged in protected conduct when she submitted race discrimination charges to the OCRC and the EEOC in September 2022. (ECF No. 1 at 13). She further contends that this protected conduct continued through October of 2024 as she pursued her race discrimination claims in this Court and the Sixth Circuit on appeal. (*Id.*). Solis argues that as a result of her protected conduct from 2022-2024, she was not hired for the Addiction Medicine APP position. (*Id.*). In opposition, the Medical Center argues that Solis' protected conduct in 2022 is too temporally attenuated from the Medical Center's decision not to hire her for the 2024 APP position to demonstrate a causal connection. (ECF No. 38 at 28). This Court disagrees.

[6] In its reply brief, the Medical Center contends that it was unaware Solis was including her 2024 appeal as a part of her protected activity arguments. (ECF No. 44 at 7). Thus, for the first time in its reply brief, the Medical Center argues that Solis only establishes the third prima facie element. (*Id.*). Given that Solis clearly highlights that her appeal constituted protected activity in her Complaint, this Court will not consider the Medical Center's attempts to include new arguments for the first time in its reply brief. (ECF No. 1 at 13) ("Plaintiff continued to engage in protected activity through October of 2024 as she pursued and appealed her race discrimination claims against the Medical Center in U.S. District Court and the Sixth Circuit Court of Appeals.").

The Sixth Circuit has reasoned that while temporal proximity of days and weeks is often indicative of a strong causal connection in retaliation cases, such is not dispositive where the plaintiff couples temporal proximity with other evidence of retaliatory conduct or the plaintiff demonstrates that the employer acted at its first opportunity to retaliate. *George*, 966 F. 3d at 460; *Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 341 (6th Cir. 2015) ("[O]ur precedent expressly rejects the district court's position that a span of more than six months between protected activity and adverse action categorically precludes finding causation."). In *George*, for example, the Sixth Circuit reasoned that while the University could have fired the plaintiff at a much earlier time if it were truly being retaliatory, the plaintiff had a contract requiring the university to continue providing benefits to the plaintiff until a certain time which created a financial incentive for the university not to fire the plaintiff immediately. *George*, 966 F. 3d at 460–61. Therefore, the Sixth Circuit reasoned that the university terminating the plaintiff a few weeks after the benefits deadline elapsed demonstrated that the university retaliated at its first opportunity to act. *Id.*

Here, Solis filed her first lawsuit in April of 2023. (ECF No. 1 at 4). She subsequently filed her appeal of the 2023 lawsuit in March of 2024, and the appeal was still pending until October 2024. (*Id.* at 5). Plaintiff applied for and was denied the Addiction medicine APP position in May of 2024, while she was in active litigation with the Medical Center related to the 2023 lawsuit. (*Id.* at 3–5). Therefore, Solis was engaged in protected activity until this Court's appeal was affirmed in October 2024, well after the alleged retaliatory conduct occurred, and only two months had elapsed between the initiation of the appeal and Solis not being selected for the position. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (measuring temporal proximity from the time the appeal was affirmed (the protected activity date) to the time of retaliatory conduct (the

firing date)). Thus, this Court does not find it to be true that that Solis' protected activity was too temporally distant from her not being selected for the job.

Additionally, like in *George*, Solis' interview was the first opportunity for Grose to retaliate against her after learning of her charges of discrimination, as it was the first contact she had with Grose since 2021. Even more telling in the retaliation context is that Grose, who was aware of Solis' litigation, did not even rank her for the initial interview process. (ECF No. 22 at 26). Conversely, Yadav, who was unaware of Solis's protected activity, ranked her as a candidate worthy of an initial interview. (ECF Nos. 1-5, 1-6). Solis further testified that Grose was abrupt, curt, and appeared disinterested during the 2024 interview. (ECF No. 31–32). She noted that his demeanor was remarkably different from the first time the two had interacted. (*Id.*). Accordingly, this Court finds that such is sufficient to establish a causal connection between Solis' protected activity and her not being selected for the Addiction Medicine APP position.

For the reasons set forth above in the race discrimination pretext analysis section, this Court also finds that Solis established pretext for her retaliation claims.

Accordingly, the Medical Center's motion for summary judgment as to the Title VII retaliation claim is **DENIED**.

## IV. CONCLUSION

For the reasons stated above, this Court **DENIES** the Medical Center's Motion for Summary Judgment (ECF No. 38) and Solis's Motion for Leave to File a Sur-Reply (ECF No. 45).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 21, 2026**